Commonwealth *v.* Baer et al., Appellants.

Argued December 16, 1966. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, HOFFMAN, and SPAULDING, JJ.

*Perry J. Shertz* and *Mitchell Jenkins,* with them *Rosenn, Jenkins & Greenwald,* for appellants.

*Thomas E. Mack,* District Attorney, with him *Richard M. Goldberg,* Assistant District Attorney, and *Arthur L. Piccone,* First Assistant District Attorney, for Commonwealth, appellee.

OPINION BY HOFFMAN, J., March 23, 1967:

Appellants Gerald Baer and Virgil Serafine operate tobacco and confectionery shops in the City of Wilkes-Barre. Each stocks a number of paperback books and

magazines. In September of 1963, both men were charged with possessing with intent to sell and selling certain obscene publications in violation of the Act of June 24, 1939, P. L. 874, §524, as amended, 18 P.S. §4524.[1] Their cases were consolidated for trial in the Court of Quarter Sessions of Luzerne County, and a jury returned verdicts of guilty generally. Each of the appellants was fined $500 and costs.

The dispositive question on this appeal is whether the book and magazines involved were properly found to be obscene and therefore not entitled to protection under the First and Fourteenth Amendments. We conclude that the materials before us are not obscene and that the judgments must accordingly be reversed.

At the outset, we reject the Commonwealth's contention that this Court is bound by the jury's finding of "fact" that the questioned publications merit suppression. Since only "obscenity" is denied constitutional protection, the question whether a particular work is obscene necessarily entails a subtle issue of constitutional law. *Jacobellis v. Ohio,* 378 U.S. 184, 188 (1964).

As Justice HARLAN eloquently stated, in his concurring opinion in *Roth v. U.S.,* 354 U.S. 476, 497-98 (1957): "Every communication has an individuality

---

[1] "Whoever sells, lends, distributes, exhibits, gives away or shows or offers to sell, lend, distribute, exhibit or give away or show, or has in his possession with intent to sell, lend, distribute or give away or to show . . . any obscene literature, book, magazine, pamphlet, newspaper, storypaper, writing, drawing, photograph, figure or image, or any written or printed matter of an obscene nature, or any article or instrument of an obscene nature . . . shall be sentenced to imprisonment not exceeding two (2) years, or to pay a fine not exceeding two thousand dollars ($2000), or both.

" 'Obscene,' as used in this section, means that which, to the average person applying contemporary community standards, has as its dominant theme, taken as a whole, an appeal to prurient interest."

and 'value' of its own. The suppression of a particular writing or other tangible form of expression is, therefore, an *individual* matter, and in the nature of things every such suppression raises an individual constitutional problem, in which a reviewing court must determine for *itself* whether the attacked expression is suppressible within constitutional standards. . . . I do not think that reviewing courts can escape this responsibility by saying that the trier of facts, be it a jury or a judge, has labeled the questioned matter as 'obscene,' for, if 'obscenity' is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of constitutional *judgment* of the most sensitive and delicate kind." See also *People v. Richmond County News, Inc.,* 9 N.Y. 2d 578, 216 N.Y.S. 2d 369, 175 N.E. 2d 681 (1961) (per FULD, J.) ; *Zeitlin v. Arnebergh,* 59 Cal. 2d 901, 383 P. 2d 152 (1963) (per TOBRINER, J.).

It is true, of course, that evidence of "pandering"—the business of purveying material openly advertised to appeal to the erotic interest of one's customers—may prove decisive in certain close cases. *Ginzburg v. U.S.,* 383 U.S. 463 (1966). We need not determine here, however, whether such a finding would foreclose full review of the obscenity question in this Court. The instant case was not tried on that theory and the Commonwealth introduced no evidence which would charge the appellants with "commercial exploitation" of the sort demonstrated in *Ginzburg.* These convictions must be reviewed under the strict standards applicable in determining the scope of material which is protected by the Constitution. *Memoirs v. Massachusetts,* 383 U.S. 413, 420-21 (1966).

Preliminarily, Section 524 of The Penal Code requires a determination that the material in question ". . . to the average person applying contemporary community standards, has as its dominant theme, taken as

a whole, an appeal to prurient interest." That standard, first enunciated in *Roth v. U.S.*, 354 U.S. 476, 489 (1957), has been refined in later decisions.[2] Before a work may be deemed "obscene," three tests must be independently satisfied: "[I]t must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value."[3] *Memoirs v. Massachusetts*, supra at p. 418; *Smith v. Crumlish*, 207 Pa. Superior Ct. 516, 520 n, 218 A. 2d 596, 599 n (1966).

It is critical to recognize that the *Roth* standard requires, in the first instance, a determination that the material is "patently offensive." It must go *substantially beyond ordinary candor* in the description or representation of sexual matters. "In the absence of such a deviation from society's standards of decency, we do

[2] The statutory definition must be read as incorporating the Supreme Court's most recent qualifying language, to save the constitutionality of the Act.

[3] Whether "community standards" are national or local in scope must be regarded as not finally settled, since five Justices of the Supreme Court have not agreed on a single formulation. We incline toward the view of Justice BRENNAN that the standards are those of the nation at large, for the reasons persuasively stated in *Jacobellis v. Ohio*, supra, at 192-195. But cf. *William Goldman Theatres v. Dana*, 405 Pa. 83, 97, 173 A. 2d 59, 66 (1961). We need not resolve the question here, however, since expert witnesses for the Commonwealth and the defense characterized the standards of the Wyoming Valley community as substantially comparable to those of other communities throughout the nation. In addition, the Commonwealth, in its brief, concedes that local and national standards are "essentially similar" for purposes of this case. Finally, the defendant relies principally on exhibits culled from the advertising pages of national magazines, all of which circulate in Luzerne County.

not see how any official inquiry into the allegedly prurient appeal of a work of expression can be squared with the guarantees of the First and Fourteenth Amendments." *Jacobellis v. Ohio,* supra, at 192. An opposite result, as Justice HARLAN has observed, ". . . might well put the American public in jeopardy of being denied access to many worthwhile works in literature, science, or art. For one would not have to travel far even among the acknowledged masterpieces in any of these fields to find works whose 'dominant theme' might, not beyond reason, be claimed to appeal to the 'prurient interest' of the reader or observer." *Manual Enterprises v. Day,* 370 U.S. 478, 487 (1962).

We have applied the above standard to the publications in question. The first, a book titled "The Cruel Touch," describes an adulterous affair between a young man and his employer's wife. The novel relates five sexual encounters, but studiously avoids offensive language as well as any suggestion of sexual deviation. The remaining exhibits are two magazines titled "Follies" and "Gala." These consist largely of photographs of nude and semi-nude young women, some in mildly seductive poses. In no case are the genital areas of the models exposed nor is there any offensive textual material.

Our own independent examination of these publications leads us to conclude that the worst that can be said of them is that they are vulgar and tawdry. But that is not enough to make them obscene. They are not so offensive on their face as to affront contemporary standards of decency. See *Manual Enterprises v. Day,* supra; *Excellent Publications, Inc. v. U.S.,* 309 F. 2d 362 (1st Cir. 1962). Nudity alone is not necessarily obscenity, as the courts have often pointed out, *Manual Enterprises v. Day,* supra; *Sunshine Book Co. v. Summerfield,* 355 U.S. 372 (1958), and the portrayal of adultery as acceptable behavior, while disagreeable to

many, may not form the basis of an obscenity prosecution. *Kingsley International Pictures Corp. v. Regents of the Univ. of the State of N. Y.,* 360 U.S. 684 (1959).

The word "obscene," as Judge LEARNED HAND once observed, should mark "the present critical point in the compromise between candor and shame at which the community [has] arrived here and now." *U.S. v. Kennerley,* 209 F. 119, 121 (S.D.N.Y. 1913). In that sense, it is a fluid standard to which we must adhere. Mid-Victorian mores or even the morality and understanding of a generation ago are inappropriate guidelines to the limits of protected expression today.

It may be, as some have suggested, that our modern sensibilities have been blunted by the massive emphasis of sexually provocative material on television and in the cinema. Indeed, the advertisements of our best magazines, in the candid language of Justice DOUGLAS, "are chock-full of thighs, ankles, calves, bosoms, eyes, and hair, to draw the potential buyer's attention to lotions, tires, food, liquor, clothing, autos, and even insurance policies." *Ginzburg v. U.S.,* supra, at 482 (dissenting opinion). Such, whether we approve or disapprove, is the temper of our times.

Against a background of that sort, we cannot say that the publications before us are so deliberately corruptive, or so offensive to common decency under prevailing standards of taste as to warrant prosecution. Vulgar and tawdry they may be, but so is much in our society. Since "[t]he community cannot, where liberty of speech and press are at issue, condemn that which it generally tolerates," *Smith v. California,* 361 U.S. 147, 171 (1959) (concurring opinion), appellants' convictions cannot stand.

We recognize the Commonwealth's legitimate interest in preventing the distribution of material deemed harmful to children. This Court shares the community's concern that these publications may have a harm-

ful and undesirable influence on the malleable minds and emotions of young people. But that interest and concern does not justify the total suppression of such material. We may not, through prosecutions of this sort, "reduce the adult population . . . to reading only what is fit for children." *Butler v. Michigan,* 352 U.S. 380 (1957).

It is undoubtedly within the province of the Legislature to enact laws specifically prohibiting the distribution to juveniles of materials deemed obscene as to them. See *Bookcase, Inc. v. Broderick,* 18 N.Y. 2d 71, 271 N.Y.S. 2d 947, 218 N.E. 2d 688 (1966); *Commonwealth v. Robin,* 421 Pa. 70, 72, 218 A. 2d 546, 547 (1966) (concurring opinion).[4] The present prosecutions, however, are not based upon an enactment proscribing sale of offensive matter to children. We are concerned here with sale to the public at large. On review, therefore, we have adhered to the strict standards applicable in determining whether the questioned material is constitutionally protected. *Jacobellis v. Ohio,* supra.

In summary, we hold that the materials before us are not "patently offensive," and therefore not obscene, within the standards enunciated by the United States Supreme Court in *Jacobellis v. Ohio,* supra, and *Memoirs v. Massachusetts,* supra. Consequently, these publications are protected expression under the First and Fourteenth Amendments. Under our statute and

---

[4] In *Robin,* Justice ROBERTS stated: "Carefully drawn restrictions on the sale or distribution of such material to juveniles would in no way embody a novel approach. Courts have traditionally sanctioned policies which seek to accord special protection and treatment to our youth in such areas as the sale of intoxicating beverages, cigarettes and firearms; the operation and ownership of motor vehicles; the trial of juvenile offenders; and in many matters relating to their health, welfare, education and employment."

as a matter of federal constitutional law, their sale and distribution, without more, may not be subjected to criminal penalties.

·Judgments reversed and defendants discharged.

Montgomery, J., dissents and would affirm the judgments of sentence on the decision of the court below.